USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9-7-11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LEON BENSON, | |
| Plaintiff, | **REPORT AND** |
| | **RECOMMENDATION** |
| - against - | |
| | **09 Civ. 8973 (JGK) (RLE)** |
| MICHAEL J. ASTRUE, | |
| Defendant. | |

**To the HONORABLE JOHN G. KOELTL, U.S.D.J.:**

## I.  INTRODUCTION

Plaintiff Leon Benson commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging a final decision of the Commissioner of Social Security (the "Commissioner") denying his claim for disability benefits.  Benson moved for a judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure on October 6, 2009, asking the Court to find that he is disabled for less than sedentary work, and to remand the case either solely for the calculation of benefits or for additional medical testimony to be taken. Benson argued that the administrative law judge ("ALJ") committed several legal errors, and that the ALJ's decision was not supported by substantial evidence.  On May 3, 2010, the Commissioner cross-moved for a judgment on the pleadings, asking the Court to affirm the Commissioner's final decision.  For the reasons that follow, I recommend that Benson's motion be **GRANTED** and that the case be **REMANDED** for the ALJ to explain his reasoning with regard to Benson's treating physician's opinion.

## II. BACKGROUND

### A. Procedural History

Benson applied for disability insurance benefits and social security income on March 25, 2008. (A.R. at 44-45.)[1] After his applications were denied, Benson requested a hearing before an ALJ. (*Id.* at 11-12.) On May 19, 2009, Benson appeared with an attorney and testified at a hearing before ALJ Mark Hecht. (*Id.* at 27-43.) ALJ Hecht subsequently issued an opinion finding that Benson was not disabled under the Act and was not entitled to disability insurance benefits. (*Id.* at 16-26.) Benson requested review by the Appeals Council on September 11, 2009. (*Id.* at 174-78.) On September 24, 2009, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Benson's request for review. (*Id.* at 1-4.) Benson filed this action on October 6, 2009.[2] (Pet. at 3.)

### B. The ALJ Hearing

#### 1. Benson's Testimony at the May 19, 2009 Hearing

Benson was born on July 28, 1976. (A.R. at 31.) He has an eighth grade education, which was completed in a special education program. (*Id.* at 32.) After leaving school sometime between the ages of ten and thirteen, Benson worked by packing bags at supermarkets. (*Id.* at 32-34.) Between 1995 and 2005, Benson worked in a warehouse and as a security guard for a number of warehouse companies. (*Id.* at 34.)

Benson testified that he injured his back and his knees while lifting packages in 2000, and that he subsequently received Worker's Compensation benefits for about nine months. (*Id.* at 35-37.) He also received physical therapy, and his physical therapy treatment was ongoing at the date of his testimony. An MRI revealed that Benson suffered from "some type of bulging

---

[1] "A.R." refers to the administrative record filed by the Commissioner with his Answer. (*See* Doc. 7.)
[2] Benson filed a pro se action on October 6, 2009, and his attorney's notice of appearance was filed on May 25, 2010.

syndrome" in his back and his knees, and that there was "something loose in [his] knees." (*Id.* at 36-37.) Benson's doctor suggested surgery, but could not guarantee that the condition would improve, and Benson chose not to have the surgery. (*Id.* at 36.) According to Benson, his condition has deteriorated since the date of injury, and he suffers from severe daily pain in his lower back and knees. (*Id.* at 36-38.) He stated that he is able to sit comfortably for six to seven minutes before his back stiffens and begins to ache. (*Id.* at 38.) He is able to walk about five to ten blocks, and he is able to lift or carry objects that are up to five or ten pounds. (*Id.*) Each day, Benson attends physical therapy, takes medication, and performs exercises prescribed by his doctor. (*Id.*)

In addition to pain in his lower back and knees, Benson testified that he feels physical pain in his feet and his left wrist. He testified that the plantar fasciitis[3] in his feet causes him to "feel sharp pains at the bottom of [his] feet when [he] stand[s], when [he] sit[s] or when [he] get[s] up in the morning." (*Id.* at 40.) He receives physical therapy and twice-a-month cortisone steroid shots for his foot condition, which has not improved. (*Id.* at 40-41.) Benson injured his wrist while lifting a package at work, and testified that he is unable to push and pull objects with his left hand due to pain. (*Id.* at 41-42.)

Benson also testified that he suffers from chronic bronchial asthma, irritable bowel syndrome, depression, and seasonal allergies. (*Id.* at 38-40.) The occurrence of asthma attacks depends upon the weather and his physical condition, and Benson testified that his asthma has previously required hospitalization and treatment with a ventilation pump. (*Id.* at 38.) Benson's irritable bowel syndrome becomes bothersome due to his stress level and the types of foods that he consumes. (*Id.* at 39.) He began feeling depressed after becoming unemployed, and he

---

[3] Plantar fasciitis is the inflammation of tissue in the sole of the foot. *Dorland's Illustrated Medical Dictionary* 608, 611, 1301 (28th ed. 1994).

3

speaks to his medical doctors about his depression "from time to time." (*Id.* at 38-39.) Benson

does not take medication for his depression and he has not been referred to a psychiatrist or a

psychologist. (*Id.* at 39.) He did not specify what type of treatment, if any, he receives for his

seasonal allergies.

Benson testified that, at the time of the hearing, he did not have difficulty bathing,

buttoning his clothing, or tying his shoes because of his wrist injury. (*Id.* at 42.) However, he

felt pain in his back when he bent down. (*Id.*) He also had difficulty sleeping at night due to his

depression and his back pain. (*Id.*) Benson stated that he could neither perform work that

required him to stand, because he could not stand long periods of time, nor work that involved

sitting down, because he believed his physical condition would deteriorate if he "stayed in one

area for too long." (*Id.* at 39.) When asked to expand upon his inability to work, Benson stated,

"I wouldn't be able to work because … my condition seems like it's not improving. It's

deteriorating. The physical therapy is not helping me out. From time to time I feel depressed.

The medication, seems like, I feel like it's slowing me down since I've been taking medication

with the side effects that I've been feeling."[4] (*Id.* at 42-43.)

### 2. Medical Evidence

Benson's earliest medical report on record is dated April 24, 2003. (*Id.* at 446.) He

sought treatment from Dr. Gabriel L. Dassa, an orthopedic surgeon at All Med Medical and

Rehabilitation Center ("All Med"), for a work-related injury to his left wrist that had previously

required an emergency room visit. (*Id.*) The doctor noted swelling, tenderness, and a reduced

range of motion in the left wrist. (*Id.* at 446-47.) Dr. Dassa further noted that Benson likely had

a wrist sprain/strain, and that his disability status was "total." (*Id.* at 447.) Dr. Dassa ruled out a

---

[4] Side effects of Benson's medication include headaches, dizziness, and loss of appetite. (A.R. at 43.)

triangular fibrocartilage[5] complex (TFCC) tear and recommended treatment that included physical therapy, a splint, medication, and an x-ray. (*Id.*)

Benson's subsequent orthopedic evaluation occurred on April 28, 2003, and Dr. Dassa noted that Benson's x-rays showed "some irregularity at the distal radial ulna joint." (*Id.* at 444.) He recommended an MRI of Benson's left wrist to definitively rule out a TFCC tear. (*Id.*) The May 13 MRI showed a "small joint effusion," "no evidence of underlying fracture or dislocation," and "increased signal within the medial side of the triangular fibrocartilage suspicious for underlying tear with a small associated effusion of the distal radioulnar joint." (*Id.* at 443.) Benson received follow-up treatment for his wrist injury at the All Med office on May 29 and June 6, 2003. (*Id.* at 441-42.)

Benson has an extensive record at Lincoln Medical and Mental Health Center ("Lincoln Medical"), which dates back to December 2005, when he sought treatment for wrist and back pain. (*Id.* at 217, 221.) Dr. Abul-Quader, a radiologist, noted that the bony structures and soft tissues in Benson's left hand appeared to be intact, and wrote that the hand did not appear to have any fractures or dislocations. (*Id.* at 217) A December 31 x-ray report did not reveal abnormalities in Benson's lower spine. (*Id.* at 221.) Benson returned to Lincoln Medical in early 2006 for examination of his chest and right knee, and they appeared normal. (*Id.* at 218-19.) A January 19 brain CT also yielded normal results. (*Id.* at 222.)

On March 2, 2006, Benson visited the Morris Heights Health Center ("MHHC") for primary care treatment. (*Id.* at 369.) During a physical examination performed by Dr. Robin Raschard, Benson noted pain in his right knee that arose on and off during the previous three weeks. Dr. Raschard referred Benson for an x-ray, prescribed Naproxen, and advised him to use

---

[5] Fibrocartilage is defined as "a type of cartilage made up of typical cartilage cells (chondrocytes), with parallel thick, compact collagenous bundles forming the interstitial substances, separated by narrow clefts enclosing the encapsulated cells." *Dorland's Illustrated Medical Dictionary* 626 (28th ed. 1994).

BenGay, a warm compress, and perform daily stretches. (*Id.*) Right and left knee x-ray results did not show any signs of fracture, dislocation, effusion, lesions, or damage to surrounding soft tissues. (*Id.* at 360.) Benson complained of continued knee pain when he returned for laboratory results on March 9. (*Id.* at 353, 359.)

Benson returned to All Med on March 20, 2006, for treatment for his knee and back pain. (*Id.* at 243-46.) An MRI of Benson's spine showed multiple levels of degenerative disc disease at the C4-5, C5-6, and C6-C7 areas. (*Id.* at 262.) Dr. Dassa noted swelling and tenderness in Benson's right knee and diagnosed Benson with a right knee sprain. (*Id.* at 243-46.) Dr. Dassa prescribed Celebrex, recommended physical therapy three times a week, and referred Benson for an MRI. (*Id.* at 246.) The MRI of Benson's right knee showed an effusion[6] with no evidence of fracture or acute meniscal tear.[7] (*Id.* at 263.) Dr. Dassa's follow-up exam noted that the right knee MRI results were "normal" and he recommended continued physical therapy for the right knee strain. (*Id.* at 260.) In a letter dated April 17, 2006, Dr. Dassa wrote that Benson had persistent knee pain and was "totally disabled" at the time. (*Id.* at 259.) Benson saw Dr. Dassa again on May 22, 2006, regarding pain in both of his knees. (*Id.* at 256.) Dr. Dassa recommended continued physical therapy and a knee brace. (*Id.*)

In late April 2006, Benson was diagnosed with erosive gastritis[8] at Lincoln Medical. (*Id.* at 224.) He visited MHHC on May 1, 2006, and met with Schevaughn Carr, a family nurse practitioner, because he felt stomach tightness, chest congestion, back pain, and right knee pain. (*Id.* at 351.) A doctor prescribed Singulair, Nexium, and Prevacid. (*Id.* at 355.) Benson had

---

[6] An effusion is defined as "the escape of fluid into a part or tissue, as an exudation or a transudation." *Dorland's Illustrated Medical Dictionary* 531 (28th ed. 1994).
[7] A meniscus is a "crescent-shaped disk of fibrocartilage" in the knee joint. *Dorland's Illustrated Medical Dictionary* 1012-13 (28th ed. 1994).
[8] Erosive gastritis is an "inflammation of the stomach...in which the surface [lining] is eroded, manifesting as a patchy or a diffuse lesion." *Dorland's Illustrated Medical Dictionary* 680; *see also* 570 (28th ed. 1994).

follow-up appointments at MHCC for his stomach discomfort in May and June 2006. (*Id.* at 349-50, 364-65.) An upper endoscopy and abdominal sonogram were normal, and Benson was diagnosed with gastritis and irritable bowel syndrome. (*Id.* at 350, 365.) On June 27, 2006, Benson returned to MHCC to report that he felt tightness in his left arm that reached his index finger. (*Id.* at 349.) Carr advised him to take Tylenol and watch for changes in hand color. (*Id.*)

Benson returned to Lincoln Medical on November 16, 2006. He complained that he was suffering from lower back pain and dizziness, which caused him to trip and fall while walking. (*Id.* at 215.) The nurse's assessment was normal, and Benson was not treated for any injuries. (*Id.*) He visited Lincoln Medical again on February 2, 2007, to treat a human bite to his left thumb. (*Id.* at 214.) On March 17, Benson was assaulted and treated at Lincoln Medical for a laceration to the head. (*Id.* at 213.) He also received an x-ray of his left elbow, which yielded normal results. (*Id.* at 220.) Benson returned again on April 6 and April 9, and complained of a headache, a runny and stuffy nose, sneezing, nausea, difficulty breathing, a sore throat, a productive cough, and burning on urination. (*Id.* at 211-12.) The treating nurse categorized his symptoms as "non-urgent." (*Id.*)

Benson began treatment at Foot Clinics of New York on May 10, 2007. (*Id.* at 266-73.) During his first appointment, the doctor noted onychomycosis[9] and tenderness in both feet. (*Id.* at 270-71.) Plantar response was not elicited, but muscle power and sensation were normal. (*Id.* at 269.) Benson was diagnosed with plantar fasciitis in both feet, and noted that the condition was more severe in the left foot. An x-ray revealed a plantar calcaneal heel spur.[10] (*Id.* at 273.) The doctor recommended that Benson use removable shoe pads, that he perform certain

---

[9] Onychomycosis is a type of fungal infection in the nails. *Dorland's Illustrated Medical Dictionary* 450, 1178, 1713-14 (28th ed. 1994).
[10] A plantar calcaneal heel spur is a projecting body and irregular quadrangular bone in the heel. *Dorland's Illustrated Medical Dictionary* 245, 1301, 1566 (28th ed. 1994).

exercises, and that he take trigger-point injections in the left heel and medications including

Marcaine, Lidocaine, and Kenalog. (*Id.* at 271.)

On September 18, 2007, Dr. Aaron Glockenberg, a podiatrist, wrote a letter stating that

Benson was receiving treatment for plantar fasciitis. (*Id.* at 294.) Dr. Glockenberg also wrote

that Benson was able to return to work or school without restrictions, but had to "avoid excessive

standing on the feet." (*Id.*) On November 20, 2007, Benson received a diagnosis of tinea pedis[11]

in addition to his existing diagnosis of plantar fasciitis. (*Id.* at 317.) Benson continued to receive

treatment at Foot Clinics of New York through April 1, 2008, returning at least twice a month for

injections and physical therapy. (*Id.* at 266-325.)

Benson returned to MHHC for appointments with Carr on June 1, August 7, September

21, and October 25, 2007. (*Id.* at 347, 354, 366, 367.) He received a physical examination on

June 1, and Carr assessed that Benson appeared to be "well." (*Id.* at 345.) Carr created a plan

that included anticipatory guidance, HIV testing, and counseling, and asked Benson to return for

another appointment in two weeks. (*Id.*) Carr also ordered a blood test and urinalysis, which

produced negative results. (*Id.* at 356-57.) At the August 7 appointment, Carr noted that Benson

felt pain in his feet due to plantar fasciitis, but was receiving treatment at Foot Clinics of New

York. (*Id.* at 367.) A list of Benson's problems, dated from March 2, 2006, to August 7, 2007,

included asthma, depression, plantar fasciitis, and right knee pain. (*Id.* at 354.) On September

21, 2007, Carr noted that Benson needed a dermatology referral, a nutritionist appointment, and a

third Hepatitis B vaccine. (*Id.* at 366.) One month later, at the October 25 appointment, Benson

---

[11] Tinea pedis is defined as a fungal infection "involving the feet, particularly the interdigital spaces and soles." *Dorland's Illustrated Medical Dictionary* 1713-14 (28th ed. 1994).

complained of irritation around the anus area, which caused pain while walking. (*Id.* at 347.) Carr prescribed Proctosol[12] and recommended increased consumption of fluids. (*Id.*)

On November 23, 2007, Benson was admitted to the emergency room at Mount Sinai Hospital. (*Id.* at 193-96.) He reported that a stranger had thrown him up against a pillar the previous night, and he complained of lower back pain and headaches. (*Id.* at 193.) An examination was normal and Benson was discharged. (*Id.* at 194.) He returned to Mount Sinai on December 28, 2007, March 19, 2008, and March 27, 2008. (*Id.* at 185-92.) In December 2007, Benson complained of stiffness and pain in his lower back and his right knee, and blurry vision. (*Id.* at 189-92.) An inspection was normal. (*Id.* at 190.) Benson requested and received a referral for back injury prevention with a specialist at an ophthalmology clinic. (*Id.* at 190-91.) His two March 2008 hospital visits were for back and knee pain relief. (*Id.* at 185-88.) Benson was discharged with back care tips, information about back and lumbar exercises, and a referral to an Industrial Medical Associates ("IMA") clinic. (*Id.* at 187.)

Benson's last recorded visit to MHHS was on January 9, 2008. (*Id.* at 346.) During his appointment with Carr, he complained of lower back and right knee pain. (*Id.*) Carr noted that Benson was not taking medication because he preferred to consult an orthopedic doctor. (*Id.*) An examination of Benson's back and knees appeared normal. (*Id.*) Carr referred Benson back to Dr. Dassa for orthopedic evaluation and advised him to use a heating pad on his back. (*Id.*)

Benson followed up with Dr. Dassa on January 31, 2008. (*Id.* at 253.) He complained of right knee and lower back pain, and an examination revealed tenderness in both areas. (*Id.*) Dr. Dassa also requested an MRI of Benson's lumbrosacral spine, which Benson obtained on

---

[12] Proctosol is a topical hydrocortisone cream used to relieve minor skin irritations.

February 8. (*Id.* at 264.) The MRI results showed a straightened lumbar lordosis[13], transitional vertebrae of the lumbosacral junction, bilateral SI joint disease, and L3-L4 through L5-S1 disc bulges with thecal sac compression. (*Id.*) An MRI of Benson's right knee performed on March 23 showed effusion but no fracture or acute meniscal tear. (*Id.* at 263.)

Benson visited Lincoln Medical regarding his back, knee, and joint pain in March 2008. (*Id.* at 196-208.) The doctors' findings were normal and there was no evidence of trauma. (*Id.*) Benson declined medication at his March 8 visit, but was issued repeat allergy prescriptions at his March 29 visit. (*Id.* at 198, 201, 204.) These were his most recent Lincoln Medical visits in the record.

On March 10, 2008, Dr. Dassa wrote a letter explaining that Benson had a bilateral knee patella tilt, patellofemoral syndrome, [14] and lumbar spine osteoarthritis. (*Id.* at 183.) He also explained that Benson was taking 200 mg of Celobrex and was receiving physical therapy three times a week for his spine condition. (*Id.*) At the time, Dr. Dassa assessed that Benson was "totally disabled and unable to work," but would be reevaluated at subsequent visits. (*Id.*)

Benson met with Dr. Dassa for follow-up orthopedic evaluations on March 31 and April 28, 2008. (*Id.* at 247, 413.) Dr. Dassa's impressions were that Benson continued to suffer from lumbar spine disc bulging, bilateral knee patellofemoral syndrome with patella tear, and bilateral knee patella alta. (*Id.*) In March, Benson denied radiculopathy symptoms to his lower extremities. (*Id.* at 247.) At both appointments, Dr. Dassa recommended continued physical therapy, Celebrex, a follow-up orthopedic appointment in four weeks, and a consultation with a

---

[13] Lumbar lordosis is a curvature of the part of the back and spine between the thorax and the pelvis. *Dorland's Illustrated Medical Dictionary* 960-61 (28th ed. 1994).
[14] Patellofemoral syndrome is related to the patella, a bone near the knee, and the femur, a bone that extends from the pelvis to the knee. *Dorland's Illustrated Medical Dictionary* 61, 1243 (28th ed. 1994).

neurologist. (*Id.* at 247, 413.) Benson continued to receive physical therapy through September 2008. (*Id.* at 416-40.)

As required by the New York City Human Resources Administration's public assistance program, Benson submitted two "Treating Physician's Wellness Plan Report[s]," one in April and one in September 2008. (*Id.* at 374-77.) Both reports were signed by Dr. Dassa and diagnosed Benson as having a bilateral knee patella tilt, patellafemoral syndrome, and lumbar osteoarthritis with symptoms that ruled out a herniation. (*Id.* at 374, 376.) The reports stated that Benson attended scheduled appointments, took prescribed medications, and complied with other types of treatment. (*Id.*) Benson also continued to take Celebrex and receive physical therapy. (*Id.*) Both reports indicated that Benson was totally disabled and temporarily unemployable at the time. (*Id.* at 375, 377.)

On May 1, 2008, as instructed by Mount Sinai Hospital and the Division of Disability Determination, Benson visited the IMA clinic and received an internal medicine examination from Dr. Aurelio Salon. (*Id.* at 187, 326-29.) Benson's chief complaints included bronchial asthma, allergies, irritable bowel syndrome, and pain in his lower back, knees, and feet. (*Id.* at 326.) He stated that he never had surgery, denied the use of tobacco, drugs, and alcohol, and listed Celebrex and Ventolin as his medications. (*Id.* at 326-27.) Benson also stated that he lived in a shelter, where he did household chores, watched TV, listened to the radio, and read. (*Id.* at 327.) Benson was able to shower, bathe, and dress himself. (*Id.*) Except for noting that Benson's ability to squat was limited, Dr. Salon's observations of Benson's general appearance, gait, skin and lymph nodes, head, face, eyes, ears, neck, chest, lungs, heart, extremities, and fine motor activity of hands were normal. (*Id.* at 326-29.) Musculoskeletal and neurologic examinations were also normal. X-rays of Benson's spine and right knee produced negative

11

results. (*Id.* at 328.) Dr. Salon diagnosed Benson with histories of arthralgia,[15] bronchial

asthma, and irritable bowel syndrome. (*Id.* at 329.) Dr. Salon concluded that Benson had a fair

prognosis and further stated that "there are no objective findings to support the fact that [Benson]

would be restricted in his ability to sit or stand, or in his capacity to climb, pull...or carry heavy

objects. Because of the history of bronchial asthma [Benson] should avoid smoke, dust, and

other known respiratory irritants." (*Id.*)

Carr, Benson's treating nurse from MHHP, submitted Social Security Administration

medical reports on July 1, 2008, and April 22, 2009. (*Id.* at 379-83, 390-95.) In the July 2008

report, Carr wrote that Benson visited MHHC three to four times a year. (*Id.* at 390.) Carr

diagnosed Benson with left and right knee pain, and lower back pain. (*Id.*) Carr reported that

Benson had complained of knee and back pain since March 2006. (*Id.*) His symptoms included

lower back and bilateral knee pain while walking, sitting, and standing. (*Id.*) At the time,

Benson's treatment included physical therapy, orthopedic evaluation when prescribed, and

Celebrex. (*Id.* at 391.) Benson's medication caused nausea, which he reported to Carr as

slowing down his mobility. (*Id.*) However, Benson reported that he did not need to lie down

during the day. (*Id.*) Benson's pain-producing physical conditions were described as bilateral

knee patellofemoral syndrome, bilateral knee patella alta, and lumbar disc bulge. (*Id.*) Carr was

unable to determine Benson's prognosis without orthopedic input. (*Id.*)

In the July 2008 report, Carr wrote that Benson could sit up to three to four minutes

continuously three to four times in an eight-hour workday; stand up to three to five minutes

continuously three to four times in an eight-hour workday; and walk up to ten to fifteen minutes

continuously two to three times in an eight-hour workday. (*Id.* at 392.) Car indicated that during

an entire eight-hour workday, Benson could occasionally lift and carry up to ten pounds; he

---

[15] Arthralgia is defined as "pain in a joint." *Dorland's Illustrated Medical Dictionary* 140 (28th ed. 1994).

could occasionally bend and squat; but he could never climb or reach. (*Id.* at 392-93.) Carr also wrote that Benson could use both of his hands for simple grasping. (*Id.* at 393.) He could use his right hand to push and pull arm controls, and perform fine manipulation. (*Id.*) He was unable to use arm controls and perform fine manipulation because those movements would cause pain in his left wrist. (*Id.*) Carr stated that Benson was unable to use his legs and feet for repetitive movements due to knee pain; Benson was not restricted from being around moving machinery; and Benson's medical condition totally prevented him from being in unprotected heights, being exposed to marked changes in temperature and humidity, being exposed to stress, and driving a motor vehicle, exposed to dust, fumes, and gas. (*Id.* at 393-94.) Carr further stated, "Continuous work [and] inappropriate rest will not allow proper healing of [Benson's] knees and back." (*Id.* at 383.) Finally, Carr wrote that Benson was physically able to travel by bus and subway. (*Id.*)

Carr's April 2009 medical report was similar to the July 2008 report, with some minor differences. (*Id.* at 379-83.) In the 2009 report, Carr wrote that Benson continued to visit MHHC three to four times a year, and wrote that Benson suffered from plantar fasciitis, lumbar disc bulge, bilateral patellofemoral syndrome, and bilateral patella alta since March 2, 2006. (*Id.* at 379.) Benson was described as experiencing sharp pain in both knees and the lower back while walking, standing, and sitting. (*Id.*) Carr also indicated that Benson had a decreased range of motion on bending. (*Id.*) According to the report, Benson's treatment included physical therapy, orthopedic assessments, Naproxen, Tylenol, Celebrex, and Prevacid. (*Id.* at 380.) Stomach pain, drowsiness, and nausea were listed as the side effects of the medication. (*Id.*) Carr stated that orthopedic input was needed to determine how Benson's prognosis could be addressed through improved pain relief and therapeutic and non-therapeutic intervention. (*Id.*)

13

In the second report, Carr wrote that Benson could sit up to two to three minutes continuously two to three times in an eight-hour workday; stand up to two to four minutes continuously two to four times in an eight-hour workday; and walk up to eight to ten minutes continuously two to three times in an eight-hour workday. (*Id.* at 381.)

Dr. Dassa also completed a Social Security Administration medical report on April 22, 2009. (*Id.* at 384-88.) He explained that he first saw Benson on March 20, 2006, and he continued to see him at scheduled follow-up visits every four weeks. (*Id.* at 384.) Benson's diagnoses included a knee patella tilt, patellofemoral syndrome, and lumbar spine osteoarthritis. (*Id.*) Dr. Dassa explained that Benson's lumbar disc bulging and knee osteoarthritis conditions are degenerative and will progress with time. (*Id.*) When asked to detail Benson's symptoms, Dr. Dassa wrote that Benson feels sharp pain in both knees and in his back when walking and sitting, but indicated that Benson did not have to lie down during the day. (*Id.* at 385.) Benson's treatment was described as physical therapy three times a week, Celebrex, Naproxen, and Tylenol. (*Id.*) The medications' side effects included nausea, dizziness, stomach pain, drowsiness, and headaches. (*Id.*) Dr. Dassa wrote that Benson's prognosis was guarded. (*Id.*)

Dr. Dassa further documented that Benson was able to sit up to four minutes continuously and for a total of two to three times each hour of an eight-hour workday;[16] stand up to ten minutes continuously and for a total of two to three times during each ninety-minute period in an eight-hour workday; and walk up to fifteen minutes continuously and for a total of ninety minutes in an eight-hour workday. (*Id.* at 386.) Dr. Dassa opined that during an eight-hour workday, Benson could occasionally lift and carry up to ten pounds . (*Id.*) He further determined that Benson could occasionally bend, squat, and reach, but was unable to climb. (*Id.*)

---

[16] Dr. Dassa's meaning is unclear and should be explored by the ALJ on remand.  For example, the complete quotation with regard to Benson's ability to sit states that Benson could "[s]it up to 4 minutes continuously and for a total of 1 hour (2-3 times) in an 8-hour day." (A.R. at 386.)

Benson reported that repetitive movements caused pain in his left wrist, and therefore, that his left hand was unable to push and pull arm controls or perform fine manipulation. (*Id.* at 387.) Dr. Dassa observed that Benson's feet were unable to push or pull leg controls due to knee pain, and that he was capable of being around moving machinery, but was totally unable to be at unprotected heights, be exposed to marked changes in temperature and humidity, drive a motor vehicle, and be exposed to dust, fumes and gas. (*Id.*) Dr. Dassa concluded that, although Benson was physically able to travel to and from work by bus and subway, regular and continuous work would prevent Benson's back and knees from healing properly. (*Id.* at 388.)

### 3. The ALJ's Findings

On June 18, 2009, ALJ Mark Hecht issued his decision that Benson was not disabled. (*Id.* at 16-26.) The ALJ found that the medical evidence established the existence of severe impairments, including musculoskeletal disorders involving the lumbar spine and the knees, bilateral plantar fasciitis, and asthma. (*Id.* at 25.) However, the ALJ determined that the objective clinical and laboratory findings did not support Benson's impairments. (*Id.*) The ALJ found evidentiary support for Benson's ability to perform a full range of sedentary work in environments without respiratory irritants or temperature and humidity extremes. (*Id.*) He determined that the transferability of skills was not an issue because Benson's past jobs were unskilled. (*Id.* at 24.) The ALJ ultimately concluded that Benson's severe impairments did not "meet or equal, singly or in combination, the criteria for any impairment described in" the Act. (*Id.* at 17.)

## C. Appeals Council Review

After the ALJ's decision, Benson requested a review by the Appeals Council and submitted a letter through a representative on September 11, 2009. (*Id.* at 174-78.) The Appeals Council denied Benson's request for review on September 24, 2009. (*Id.* at 1-4.)

## III. DISCUSSION

### A. Standard of Review

A reviewing court does not determine *de novo* whether a claimant is disabled. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir 1996) (citing *Mimms v. Heckler*, 750 F.2d 180, 185 (2d Cir. 1984)). Rather, the court's inquiry is limited to the question of whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such evidence is supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997) (citing *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). When a reviewing court concludes that the SSA applied the incorrect legal standard, the SSA's decision should be reversed. 42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record or to explain his reasoning. *Crysler v. Astrue*, 563 F. Supp. 2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999)).

If the court determines that the correct legal standard has been applied, and the Commissioner's finding is supported by substantial evidence, the reviewing court shall deem the Commissioner's findings of fact conclusive and affirm the decision. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citations omitted). Substantial

evidence in this context is "more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401

(quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  "[T]o determine

whether the findings are supported by substantial evidence, the reviewing court is required to

examine the administrative record, including contradictory evidence and evidence from which

conflicting inferences can be drawn." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting

*Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (*per curiam*)).  New evidence that is

submitted to the Appeals Council becomes part of the administrative record for judicial review

when the Appeals Council denies review of the ALJ's decision, provided the evidence is new

and material and relates to the period before the ALJ's decision. *Perez v. Chater*, 77 F.3d 41, 45

(2d Cir. 1996).

## B.  Evaluation of Disability Claims

Under the Act, every individual who is under a "disability" is entitled to disability

insurance benefits. 42 U.S.C. § 423(a)(1).  Disability is defined as an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The

disability must be of "such severity that [the claimant] is not only unable to do his previous work

but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is entitled to disability benefits, the Commissioner is

required to conduct the following five-step inquiry: (1) determine whether the claimant is

engaged in any substantial gainful activity; (2) if so, determine whether the claimant has a

17

"severe impairment" which significantly limits his ability to work; (3) if so, determine whether the impairment is one of the conditions for which the Commissioner presumes disability; (4) if not, determine whether the claimant is able to perform his past work despite the disability; and (5) if not, determine whether the claimant can perform other work. *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); 20 C.F.R. § 404.1520.

The Commissioner must assess the claimant's residual functional capacity ("RFC") to apply the fourth and fifth steps of the inquiry to the claimant. A claimant's RFC represents the most that claimant can do despite limitations caused by his impairments and related symptoms. 20 C.F.R. § 404.1545(a). The Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background. *Mongeur*, 722 F.2d at 1037 (citing *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980); *Rivera v. Harris*, 623 F.2d 212, 216 (2d Cir. 1980); *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir. 1978)); 20 C.F.R. § 404.1526(b). To properly evaluate a claimant's RFC, the ALJ must assess the claimant's exertional capabilities, addressing his ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. §§ 404.1545(b), 404.1569(a). The ALJ must also evaluate the claimant's nonexertional limitations, including depression, nervousness, and anxiety. 20 C.F.R. §§ 404.1545(b), 404.1569(a).

The claimant bears the burden of proving the first four steps, while the burden of proving the fifth is on the Commissioner. *Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll v. Sec'y of Dep't of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983)). In making the fifth-step determination of whether there is any other work claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national

economy which the claimant could perform." *Balsamo v Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll*, 705 F.2d at 642).

## C.  The Treating Physician Rule

The report of a claimant's treating physician is generally given more weight than other reports and will be controlling if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. §404.1527(d)(2).  When the treating physician's opinion is not given controlling weight, the ALJ "must consider various 'factors' to determine how much weight to give to the opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)).  These factors include: (1) the length, nature, and extent of the treatment relationship; (2) the evidence in support of the treating physician's opinion; (3) the consistency of the opinion with the entirety of the record; (4) whether the treating physician is a specialist; and (5) other factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(2)(i-ii) & (d)(3-6).  The ALJ is required to explain the weight he ultimately gives to the opinions of a treating physician.  *See* 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").  Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998); *see also Halloran*, 362 F.3d at 32 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion.").

The ALJ is not permitted to arbitrarily substitute his own judgment or view of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

## D. Issues on Appeal

Benson claims that the ALJ committed five errors of law.  First, he argues that the ALJ should not have applied the Medical-Vocational Guidelines ("the Grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, without obtaining vocational expert testimony. (Pl.'s Mem. at 6-12.)  Second, Benson claims that the ALJ failed to follow the Treating Physician Rule by according proper weight to his treating physicians' reports.  (*Id.* at 12-15.)  He argues that the ALJ should have explicitly recognized Dr. Dassa and nurse practitioner Carr as his primary treating sources. Third, Benson contends that the ALJ did not explain what weight he attributed to Dr. Dassa and Carr's opinions.  (*Id.* at 16-17.)  Fourth, he contends that the ALJ failed to attribute proper weight to his subjective complaints.  Fifth, Benson argues that the ALJ should not have concluded that he had the residual functional capacity to perform sedentary work without discussing his exertional and postural abilities on a function-by-function basis.  (*Id.* at 19-20.) Benson additionally contends that the Commissioner's decision was not supported by substantial evidence. (*Id.* 20-21.)

The Commissioner argues that the ALJ did not commit any legal errors, and contends that vocational expert testimony was not required because Benson does not have any significant nonexertional limitations. (Def. Reply Mem. ("Def. Reply") at 2-3.)  Additionally, the Commissioner claims that the ALJ properly assessed Dr. Dassa opinion, the ALJ wasn't required to evaluate Carr's opinions because Carr is not a physician, and further explanation of the ALJ's weight of consideration was not necessary.  (*Id.* at 3-5.)  The Commissioner also contends that the ALJ attributed proper weight to Benson's subjective complaints.  (*Id.* at 5-6.)  Finally, the

Commissioner argues that the ALJ had enough evidence to find that Benson is capable of performing sedentary work. (*Id.* at 6-7.)

### 1. The ALJ Did Not Have To Retain Vocational Expert Testimony

The ALJ consulted the Grids to determine that Benson is not disabled. (A.R. at 24-25.) Benson argues that this was error, and that the Commissioner had a responsibility to "introduce the testimony of a vocational expert that jobs exist in the economy which claimant can obtain and perform." (Pl.'s Mem. at 6 (quoting *Bapp v. Bowen*, 802 F.2d 601, 503 (2d Cir. 1986). He claims that an application of the Grids is inappropriate when there are "significant nonexertional limitations" present at the fifth step of the disability analysis, and lists his relevant nonexertional limitations as "an inability to be exposed to respiratory irritants, temperatures and humidity extremes, pain, blurry vision, headaches, depression, difficulty focusing, and an inability to deal with stress." (*Id.*) Benson asserts that the ALJ improperly made the determination that he could "perform sedentary work activity which does not require exposure to respiratory irritants or temperature and humidity extremes" without support from a vocational expert regarding the availability of appropriate substantial gainful work in the national economy. (*Id.* at 6.)

The Court agrees with the Commissioner, and finds that vocational testimony was not necessary because Benson's nonexertional limitations did not reach a level that required input from a vocational expert. *Bapp* requires vocational expert testimony only "when a claimant's nonexertional impairments significantly diminish his ability to work – over and above any incapacity caused solely from exertional limitations – so that he is unable to perform the full range of employment indicated by the [Grids]." *Bapp*, 802 F.3d at 603. Benson's nonexertional impairments are less significant than his exertional impairments, which include spine, knee, and wrist pain. While Benson's exertional impairments are severe and have prevented him from

returning to his former work as a security guard and warehouse clerk, his nonexertional

impairments, such as asthma and depression, have been managed through medication and are not

debilitating to the level that Benson claims his exertional impairments to be.[17]  The ALJ fairly

and appropriately considered Benson's nonexertional impairments when assessing the types of

environments where Benson can work.  Therefore, the ALJ did not commit a legal error by using

the Grids and choosing not to introduce vocational expert testimony to support his finding that

Benson's nonexertional impairments do not prevent him from performing sedentary work.

### 2.   The ALJ Committed an Error of Law By Failing To Provide Good Reasons For Rejecting the Treating Physician's Opinion

It is undisputed that Dr. Dassa qualifies as Benson's treating physician.  The record

shows that Dr. Dassa and Benson started meeting on a monthly basis at All Med in March 2006,

and that Dr. Dassa has repeatedly opined that Benson is totally disabled.  (A.R. at 183, 250, 259,

374-77, 384-88.)  Dr. Dassa's assessment is supported by objective medical evidence in the form

of MRIs and x-rays, which reveal evidence of spine disease, a patella tear, minor injuries to

Benson's left wrist and right knee (*id.* at 247, 262-64, 444), and by Benson's consistent

subjective complaints of pain.  The assessment is further supported by the opinions of Nurse

Carr, a nurse practitioner who treated Benson at MHHC at least eleven times between May 2006

and April 2009.  (*Id.* at 345-47, 349-51, 356-58, 364-67, 379-83, 390-95.)  Carr stated that

Benson's disability prevents him from being able to work.  (*Id.* at 379-95.)

In his decision, the ALJ did not refer to Dr. Dassa by name, and never recognized Dr.

Dassa as Benson's treating physician.  Instead, Dr. Dassa's opinions are discussed through the

---

[17] Benson's asthma is treated with medication and the asthma did not prevent him from performing prior work. Benson testified that he has been hospitalized for his asthma, but the record does not support his statement.  (A.R. at 38.)  Benson has not been officially diagnosed with depression and he does not take medication for the condition. (*Id.* at 38-39.)  Benson also claims to have headaches and pain, but the pain is more closely related to his exertional limitations, and the severity of his headaches is not adequately supported in the record.

22

ALJ's references to Benson's treatment at "All Med Medical and Rehabilitation." (*Id.* at 17-19, 21, 24). The ALJ dismissed the "determinations and estimations" reflected in these reports because they were "not supported by objective clinical findings and are inconsistent with the medical evidence of record." (*Id.* at 21.) Although the ALJ was not required to give controlling weight to Dr. Dassa's opinions, he was required to provide "good reasons" for rejecting them. *See Halloran*, 362 F.3d 28, 32-33. Because there is no indication that the ALJ recognized Dr. Dassa as a treating physician, there is no evidence that the ALJ considered the various factors mandated by the rules in assessing the weight of Dr. Dassa's opinions. For example, it unclear whether the ALJ considered: (1) the extent and duration of the treatment relationship between Dr. Dassa and Benson, which began in 2006 and continued through the hearing in this matter; (2) the evidence that supported his decision, including Nurse Carr's evaluations and the MRIs and x-rays, which revealed physical injuries; (3) the consistency of the opinion with the entire record, including Benson's consistent subjective complaints of pain, or (4) that Dr. Dassa, as an orthopedic surgeon, was a specialist in his treating area. Because the ALJ failed to recognize Dr. Dassa as a treating physician and therefore failed to properly evaluate whether to give controlling weight to Dr. Dassa's opinion, the ALJ committed an error of law that requires a remand. *Schaal*, 134 F.3d at 505 (legal error when the Commissioner fails to provide "good reasons" for not affording weight to a plaintiff's treating physician).

### 3. The Court Is Unable To Determine Whether the ALJ Properly Considered Benson's Subjective Complaints

In determining whether a claimant is disabled, an ALJ must consider subjective evidence of pain or disability as testified to by the claimant. 20 C.F.R. § 416.929(a). However, "[s]tatements about a claimant's pain cannot alone establish disability; there must be medical evidence that shows that the claimant has a medically determinable impairment that could

reasonably be expected to produce the pain or other symptoms alleged." *Fessler v. Astrue*, 09

Civ. 6905, 2011 WL 346553, *10 (S.D.N.Y. Jan. 10, 2011).  In evaluating a claimant's

subjective complaints, an ALJ will consider: (1) the individual's daily activities; (2) the location,

duration, frequency and intensity of the individual's pain or other symptoms;  (3) factors that

precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness and side effects of

any medication the individual takes or has taken to alleviate pain or other symptoms; (5)

treatment, other than medication, the individual received or has received for relief of pain or

other symptoms; (6) any measures other than treatment the individual uses or has used to relieve

pain or other symptoms; and (7) any other factors concerning the individual's functional

limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 416.929(c)(3).

At the hearing, Benson testified that he experienced significant pain in his lower back,

knees, feet, and left wrist.  (A.R. at 36-41.)  He testified that the pain made standing, sitting,

pushing, pulling, and sleeping difficult.  (*Id.*)  The medical records also reflect that Benson

frequently reported symptoms of pain and discomfort.  His subjective complaints appear

throughout the record in medical reports, doctors' and nurses' notes, and Function Reports.  For

example, in an April 16, 2008 Function Report, Benson detailed how his physical impairments

impact his daily life, and wrote about his medical treatment, his pain's effect on his daily

activities in a shelter, his decrease in physical and social activities, his depression and loss of

focus, and his work history.  (*Id.* at 154-72.)

In his decision, the ALJ stated that he "considered the nature, location and intensity of the

pain and other symptoms, any precipitating or aggravating factors, the effectiveness of

medication and other treatment, and [Benson's] activities" and concluded that Benson's

"subjective complaints are not adequately supported by objective findings in the record and are

inconsistent with his activities." (*Id.* at 24.)  A review of the decision shows that the ALJ considered Benson's subjective complaints as reflected in his testimony and in the medical records, and considered clinical evidence inconsistent with his subjective complaints. Nevertheless, because the Court cannot determine whether the ALJ gave the appropriate weight to Dr. Dassa's opinion, the Court is unable to assess whether the ALJ considered all the medical evidence that supported Benson's subjective complaints.

### 4.  The ALJ Properly Addressed Benson's Residual Functional Capacity to Perform Sedentary Work

The ALJ addressed Benson's physical abilities throughout his decision, often on a function-by-function basis. (A.R. at 17-22, 24.)  With regard to Benson's hands, the ALJ noted that he had a full range of motion in his left wrist, that he had the ability to use his hands without difficulty, and that he had indicated an uninhibited ability to bathe, shower, and dress. (*Id.* at 17, 19, 24.)  With respect to Benson's ability to stand and walk, the ALJ noted that the record lacked documentation to show that he was unable to perform sedentary work activity, especially because there was a discrepancy about his use of a cane, and because he was able to use public transportation. (*Id.* at 19-21, 24.)  Overall, the ALJ properly addressed Benson's residual capacity on a function-by-function basis.

### D.  The Court is Unable to Determine Whether the ALJ's Decision Was Supported by Substantial Evidence

The Commissioner committed a legal error in failing to properly explain his application of the Treating Physician Rule.  Therefore, the Court cannot accurately apply the "substantial evidence" standard. *See Johnson*, 817 F.2d at 986-87.

**E. Remedy**

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. Remand for additional fact development may be appropriate if "there are gaps in the administrative record or the ALJ has applied an improper legal standard." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999). In this case, the ALJ committed a legal error when he failed to fully explain his reasons for rejecting Benson's treating physician's opinions. The Court therefore cannot apply the substantial evidence standard. The case must be remanded for the ALJ to fully explain his reasoning for discounting Dr. Dassa's finding of total disability.

## F. CONCLUSION

For the foregoing reasons, I recommend that the Commissioner's motion for judgment on the pleadings be **DENIED**, Benson's motion be **GRANTED**, and that the case be **REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) to

(1) Comprehensively reconsider Benson's case;

(2) Comprehensively consider the inconsistencies in Dr. Dassa's assessments in accordance with 20 C.F.R. §§ 404.1527(d)(2)(i-ii), (d)(3-6);

(3) Explain the weight given to Dr. Dassa's various opinions in accordance with 20 C.F.R. § 404.1527(d)(2); and

(4) Comprehensively reconsider Benson's subjective complaints in light of Dr. Dassa's testimony,

Pursuant to Rule 72, Federal Rules of Civil Procedure, the Parties shall have fourteen (14) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of

the Court and served on all adversaries, with extra copies delivered to the chambers of the

Honorable John G. Koeltl, 500 Pearl Street, Room 1030, and to the chambers of the undersigned,

500 Pearl Street, Room 1970.  Failure to file timely objections shall constitute a waiver of those

objections both in the District Court and on later appeal to the United States Court of Appeals.

*See Thomas v. Arn*, 474 U.S. 140, 150 (1985); *Small v. Sec'y of Health and Human Servs.*, 892

F.2d 15, 16 (2d Cir. 1989) (*per curiam*); 28 U.S.C. § 636(b)(1) (West Supp. 1995); Fed. R. Civ.

P. 72, 6(a), 6(d).

**DATED: September 7, 2011**
**New York, New York**

                                        **Respectfully Submitted,**

                                        The Honorable Ronald L. Ellis
                                        **United States Magistrate Judge**


**Copies of this Report and Recommendation were sent to:**

Attorney for Plaintiff
Montel Cherry-Slack
Manhattan Legal Services
90 John Street, Suite 301
New York, NY  10038

Attorney for Defendant
Susan C. Branagan
Assistant United States District Attorney
Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY  10007